**LONG ISLAND LIGHTING COMPANY, Plaintiff,**

v.

**TRANSAMERICA DELAVAL, INC., Defendant.**

**No. 85 Civ. 6892 (GLG).**

United States District Court, S.D. New York.

Oct. 27, 1986.

Hunton & Williams, New York City, Richmond, Va., for plaintiff; Robert M. Rolfe, Richmond, Va., David Dreifus, Raleigh, N.C., of counsel.

Weil, Gotshal & Manges, Rosenman Colin Freund Lewis & Cohen, New York City, for defendant; Ira M. Millstein, James W. Quinn, Mindy J. Spector, Robert E. Smith, Richard F. Bernstein, of counsel.

GOETTEL, District Judge.

Much has already been written in the continuing saga of the Shoreham Nuclear Power Station ("Shoreham"). This, unfortunately, is yet another chapter.

## BACKGROUND

In 1965, plaintiff Long Island Lighting Company ("LILCO") initiated plans to construct a nuclear power plant on Long Island. Pursuant to requirements of the Nuclear Regulatory Commission ("NRC"), the plant had to include a reliable, independent onsite power source capable of running cooling and various other systems necessary to assure the safe shutdown of the reactor in case of emergency. In December 1973, LILCO issued specifications and invited defendant Transamerica Delaval, Inc. ("TDI") to bid on the design and manufacture of three emergency diesel generators (the "diesels") for the Shoreham facility. On May 20, 1974, LILCO issued a purchase order, awarding TDI the contract to manufacture the diesels. The diesels were delivered to Shoreham in 1976, but were not installed until 1981.[1] In August

---

1. Both parties knew that the diesels would be stored prior to being installed at Shoreham, although neither apparently anticipated a five-year delay. However, LILCO has not alleged that TDI caused the initial delay in installation.

1983, during preoperational testing, the crankshaft in one of the three diesels broke. The other diesels were then inspected and cracks were found in their crankshafts as well.

LILCO retained a consultant who determined that the crankshafts were undersized and, as a result, the torsional stresses occurring at normal operating engine speeds were excessive. The consultant discovered additional defects in the diesels, including cracks in the connecting rod bearings and cylinders.

The 1983 diesel failure came under scrutiny by the New York State Public Service Commission (the "PSC") as part of its investigation into the increased costs and delays in the construction of Shoreham. The PSC had initiated its investigation in 1979, but separated it into two phases. The phase regarding costs began in August 1981. Hearings were held in November 1981 and supplemental hearings in November 1983. On March 13, 1985, two PSC administrative law judges (the "ALJs") issued their recommended decision ("ALJs' Recommended Decision"), in which they concluded that LILCO had imprudently managed the construction of Shoreham and should be held responsible for a substantial portion of the resulting cost increases. On December 16, 1985, the PSC issued an Opinion and Order Determining Prudent Costs (the "PSC Opinion"), affirming the ALJs' conclusion. The PSC Opinion noted, however, that its finding of imprudence by LILCO did not preclude a judicial finding

that TDI failed to meet all of its legal obligations to LILCO.

LILCO filed this action against TDI in August 1985. The complaint sets forth eleven causes of action, including breach of contract, breach of warranty, fraud, negligence, strict products liability, and violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (1982).[2] TDI moves to dismiss the complaint on a variety of grounds. It asserts that LILCO's claims are untimely, should be barred by judicial and collateral estoppel, and fail to state claims upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6).[3] As discussed below, the defendant's motion is granted in part and denied in part.

## DISCUSSION

In challenging the sufficiency of the complaint, the defendant bears the burden of proving that under no interpretation of the facts set forth in the complaint can the plaintiff succeed. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed. 80 (1957). For purposes of this motion, all of the plaintiff's allegations are deemed true and no claim can be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.; Hughes v. Rowe*, 449 U.S. 5, 10, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980).

TDI first asserts the affirmative defenses of judicial and collateral estoppel as

---

**2.** Jurisdiction is premised on diversity of citizenship, 28 U.S.C. § 1332 (1982), rather than a federal question, 28 U.S.C. § 1331 (1982). The plaintiff is a New York corporation with its principal place of business in New York. The defendant is a Delaware corporation with its principal place of business "in a State other than the State of New York." Complaint ¶ 2. At oral argument of this motion, we questioned whether venue was properly placed in this district since the plaintiff does no business here and the claims arose in the Eastern District of New York. The defendant, however, does not object to this venue and contends that it has an office, albeit not its principal place of business, in this district. Thus, it seems that venue is proper. *See* 28 U.S.C. § 1391(c) (1982).

**3.** Hundreds of pages of briefs, affidavits, and exhibits have been submitted on this motion to dismiss. Although Rule 12(b) allows us to convert this to a motion for summary judgment, we decline to do so. Discovery has not yet been completed. At that time, no doubt, the parties would wish to submit many more hundreds of pages in support of their respective positions. This motion can be fully and fairly decided upon the pleadings, along with the contract, which we deem incorporated by reference into the complaint. *See Goldman v. Belden*, 754 F.2d 1059, 1065–66 (2d Cir.1985). The only other documents upon which we rely are the decisions of the Public Service Commission, which are matters of public record.

overall bars to LILCO's claims. The defendant then challenges each cause of action on one or more grounds. We consider TDI's general estoppel defenses before proceeding to examine its arguments against the plaintiff's individual claims.

## I. *Affirmative Defenses*

### A. *Judicial Estoppel*

■ The doctrine of judicial estoppel allows a court to preclude a party from asserting a position contrary to one upon which it prevailed in a prior proceeding.[4] This doctrine, sometimes called "[p]reclusion by inconsistent positions," 1B J. Moore, J. Lucas & T. Currier, *Moore's Federal Practice* ¶ 0.405[8] at 239 (2d ed. 1984), protects judicial integrity by preventing a litigant from playing "fast and loose" with the court. *Id.* at 240. "The concern is to avoid unfair results and unseemliness." 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4477 at 779 (1981).

LILCO took the position before the PSC that it should not be held responsible for the cost of the diesel-related delays at Shoreham because, regardless of the diesel problems, Shoreham could not operate without an emergency evacuation plan, which the relevant authorities refused to approve. Because approval of the emergency plan was beyond its control, LILCO disclaimed liability for the delay costs, and sought to pass these costs along to its customers.

Initially, we note that LILCO was not successful in its position. The PSC barred LILCO from including in its rate base both the direct cost of the diesel failure and the cost of delays related thereto, since it found that the "failure of the diesels had a direct bearing on subsequent delays."

PSC Opinion at 124. The direct cost of the diesel failure was estimated at $95 million. *Id.* at 103, 126. As for delay costs, the PSC concluded that Shoreham would have become operational in April 1984, had the diesels not failed in August 1983. *Id.* at 119 n. 2. Therefore, the PSC required LILCO, not its customers, to absorb the delay costs from April 1984, to March 1986, by which time the diesels had been approved and Shoreham could have commenced operation had LILCO been able to obtain approval of an emergency evacuation plan. *Id.* at 119–25. The total diesel delay adjustment, not counting the $95 million direct costs, was calculated as $524 million.[5] *Id.*, Appendix D at 2.

■ Success in the prior proceeding is a necessary part of the doctrine of judicial estoppel. *See Universal City Studios, Inc. v. Nintendo Co.*, 578 F.Supp. 911, 921 (S.D.N.Y.1983), *aff'd*, 746 F.2d 112 (1984). Since LILCO did not previously succeed, it should not be estopped from asserting a position that may vary from its position before the PSC.

■ Furthermore, we do not find LILCO's position before us particularly contrary to its argument to the PSC. A "superficial inconsistency must not be allowed to obscure an underlying consistency." 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4477 at 783–84 (1981) (footnote omitted). LILCO argues that, since the PSC held it liable for diesel-related delay costs, it should be allowed to recover its loss from the party it claims was responsible for the diesel problems, TDI. Simply stated, LILCO is still asserting that someone other than itself is responsible for the delays in Shoreham becoming operational, and should bear the related expenses. This is not inconsistent

---

**4.** LILCO contends that the doctrine of judicial estoppel is not recognized by the Second Circuit, and, in any event, is inapplicable to administrative proceedings. Although not uniformly accepted, courts in both this circuit and this district have estopped a party who successfully asserted a position in one proceeding (including administrative proceedings) from assuming a contrary position in a subsequent proceeding.

*See Roth v. McAllister Bros., Inc.*, 316 F.2d 143, 145 (2d Cir.1963); *Ronson Corp. v. Liquifin Aktiengesellschaft, Liquigas, S.p.A.*, 375 F.Supp. 628, 630 (S.D.N.Y.1974).

**5.** We express no opinion at this time as to whether the plaintiff may recover any or all of these costs from TDI. *See infra* note 30.

with its argument to the PSC. It may seek to skin the cat two ways, but does not necessarily constitute playing "fast and loose" with the Court. Hence, we deny that part of TDI's motion to dismiss the complaint based on judicial estoppel.

### B. *Collateral Estoppel*

TDI next asks us to give collateral estoppel effect to two decisions by panels of the Atomic Safety and Licensing Board ("ASLB"). On June 14, 1985, one ASLB panel approved the diesels for use at Shoreham. On August 26, 1985, another panel declined to grant LILCO an operating license for commercial operation at Shoreham because state and local authorities refused to cooperate in an evacuation plan. TDI contends that these findings preclude any liability on its part for the cost of delay in commercial operation of Shoreham.[6]

■ In New York, the invocation of collateral estoppel requires " 'an identity of issue which has necessarily been decided in the prior action and ... a full and fair opportunity to contest the decision said to be controlling.' " *Murphy v. Gallagher,* 761 F.2d 878, 882 (2d Cir.1985) (quoting *Schwartz v. Public Administrator,* 24 N.Y.2d 65, 246 N.E.2d 725, 729, 298 N.Y. S.2d 955, 960 (1969)). The proponent of estoppel must demonstrate the identicality of the issue, while the opponent must establish the absence of a full and fair opportunity to litigate. *Ryan v. New York Telephone Co.,* 62 N.Y.2d 494, 467 N.E.2d 487, 491, 478 N.Y.S.2d 823, 827 (1984).

■ We find it unnecessary to analyze each segment of the test for applying collateral estoppel to the ASLB decisions because TDI has failed to meet its initial burden of demonstrating an identity of issue. The ASLB panels did not address the

issue of responsibility for the increased costs at Shoreham. The fact that the diesels are now approved for use at Shoreham has no bearing on whether their previous failure caused increased construction costs. Similarly, the denial of an operating license because Shoreham lacks an approved emergency evacuation plan, does not resolve the issue of whether the diesel problems contributed to the difficulty of getting an emergency plan approved.[7] Consequently, the ASLB findings do not preclude LILCO from pursuing this suit against TDI for expenses incurred due to diesel-related problems. We therefore deny that part of TDI's motion to dismiss that rests on the purported collateral estoppel effect of the two ASLB decisions.

TDI also asks that we give collateral estoppel effect to a finding by the PSC regarding LILCO's knowledge of the diesel problems. Since this particular collateral estoppel question is intimately linked with TDI's statute of limitations defense to individual causes of action, we address it in greater detail below.

### II. *LILCO's Claims for Relief*

#### A. *Fraud*

LILCO's third cause of action alleges that TDI misrepresented and fraudulently concealed crucial information regarding the diesels, and that LILCO relied to its detriment upon these misrepresentations and omissions, both in entering into the contract and in failing to discover the defects until 1983. Initially, TDI contends that LILCO fails to state a claim upon which relief can be granted because its fraud claim is, at best, a cause of action for fraudulent breach of contract. Next, TDI asserts that any claim of fraudulent inducement is untimely. Finally, TDI argues that

---

**6.** Ironically, this argument is essentially identical to LILCO's argument before the PSC. *See supra* p. 1447.

**7.** The PSC noted that

complex events surround[ed] the emergency planning issue.... It is reasonable to conclude that failure of the diesels lessened public confidence in LILCO and Shoreham, and

hardened opposition to emergency planning. It is also reasonable to conclude that the pace of the NRC proceedings on evacuation planning was affected by the need for extensive and concurrent proceedings on the diesels over a lengthy period of time.

PSC Opinion at 123–24.

collateral estoppel effect should be afforded to the PSC's finding that LILCO was aware of the diesel defects long before 1983. Once aware of the defects, says TDI, LILCO could not justifiably rely on the defendant's purported misrepresentations, and, therefore, fails to state a cause of action for fraud; any colorable claim of fraud that accrued prior to plaintiff's awareness of the defects is barred by the statute of limitations.

In New York, "a cause of action for fraud will not arise when the only fraud charged relates to a breach of contract." *Miller v. Volk & Huxley Inc.*, 44 A.D.2d 810, 355 N.Y.S.2d 605, 606–07 (1st Dep't 1974). TDI argues that, by framing a claim in fraud, LILCO is improperly trying to extend the statute of limitations on what are essentially contract claims. *See Cabrini Medical Center v. Desina*, 64 N.Y.2d 1059, 479 N.E.2d 217, 219, 489 N.Y.S.2d 872, 874 (1985) (allegations of fraud incidental to complaint for breach of contract cannot extend statute of limitations); *Brick v. Cohn-Hall-Marx Co.*, 276 N.Y. 259, 263–64, 11 N.E.2d 902 (1937) (allegations of fraud amount to breach of contract; the only purpose in pleading fraud was to extend statute of limitations).

LILCO responds that its fraud claim is independent of any contract claim and protects different interests. We are unpersuaded by LILCO's arguments in support of this contention, most of which more properly address a claim of products liability than one of fraud. But, assuming, *arguendo*, that the plaintiff's fraud claim is independent of its contract claim, it nevertheless cannot survive TDI's other challenges.

LILCO alleges that it was fraudulently induced to enter the contract with TDI because of the latter's misrepresentations. A cause of action for "fraudulent inducement ... 'accrues when the [contract] is executed and when the party alleging fraud has given consideration and thus suffered damage.'" *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 748 (2d Cir.1979) (quoting *Dynamics Corp. of America v. International Harvester Co.*, 429 F.Supp. 341, 355 (S.D.N.Y.1977)). LILCO and TDI entered into their contract in 1974, and the plaintiff paid for the diesels by 1977.[8] Thus, the latest date on which the plaintiff's claim for fraudulent inducement could have accrued was in 1977. An action brought within six years of that time would have been timely. *See* N.Y.Civ.Prac.Law & R. § 213(8) (McKinney 1972 & Supp.1986). However, LILCO did not file this suit until 1985. Consequently, its claim of fraudulent inducement of contract is time barred.[9]

The plaintiff also asserts a claim of fraudulent concealment, alleging that TDI withheld crucial information concerning defects in the diesels. TDI had designed and manufactured the Shoreham diesels with crankshafts 13″ x 11″ in diameter. By 1975, TDI allegedly learned that it had applied incorrect data in making its calculations and that larger crankshafts were actually required. LILCO asserts that TDI failed to disclose this information and, instead, falsely represented that the Shoreham diesels met all requirements of the contract and were suitable for their intended purpose.[10] LILCO claims that TDI continued to conceal the diesel defects until

---

**8.** The complaint does not state when LILCO paid for the diesels. TDI's papers say LILCO paid by 1977 and the plaintiff does not contest this allegation. Therefore, for purposes of deciding this motion, we accept that LILCO paid for the diesels by 1977.

**9.** TDI also contends that LILCO has failed to state a claim for fraudulent inducement because the only allegedly false or misleading statements were made *after*, rather than before formation of the contract. Moreover, TDI claims that any pre-contract statements pertained only to the defendant's qualifications and, in any event, are not alleged with particularity. We need not consider the sufficiency of the plaintiff's fraudulent inducement claim since we find it to be time barred.

**10.** LILCO further contends that TDI concealed other defects, such as weld repairs, that it was required to disclose pursuant to NRC regulations. *See* 10 C.F.R. § 21.21 (1986).

1983, when the crankshaft in one diesel broke.

The New York statute of limitations for fraud is six years from the commission of the fraud or two years from the date plaintiff discovered or should have discovered the fraud, whichever is longer. *Triangle Underwriters, Inc. v. Honeywell, Inc., supra*, 604 F.2d at 746 & n. 17. The plaintiff claims that the defendant committed fraud each time TDI falsely represented that the diesels met the necessary industry standards. One such statement was allegedly made on March 4, 1981. If a new cause of action accrued at that time, LILCO's complaint, filed in 1985, was brought well within the six-year statute of limitations for fraud. *See* N.Y.Civ.Prac.Law & R. § 213(8) (McKinney 1972 & Supp.1986). Alternatively, LILCO asserts that TDI's fraudulent concealment prevented discovery of the fraud until a crankshaft broke on August 12, 1983, so that its fraud claim was timely filed on August 12, 1985, just two years after LILCO discovered the fraud.

TDI argues, however, that the crucial question regarding LILCO's fraud claim is when LILCO *discovered or should have discovered* the fraud. That issue, says TDI, has already been decided by the PSC, and should collaterally estop the plaintiff from maneuvering in the instant action to maintain its untimely and inadequate fraud claim.

We first examine whether the PSC proceeding forms a proper basis for collateral estoppel. And, if so, whether the issue of plaintiff's discovery of the defendant's alleged fraud was conclusively decided in that proceeding.

1. *Collateral Estoppel*

a. Nature of the PSC Proceedings.

■ It is undisputed that "the doctrine of ... collateral estoppel [is] applicable to give conclusive effect to the quasi-judicial determinations of administrative agencies." *Ryan v. New York Telephone Co., supra*, 478 N.Y.S.2d at 825, 467 N.E.2d 489. Quasi-judicial agency action "involves resolution of disputed issues of past conduct," while nonjudicial, legislative agency action "involves primarily the fashioning of prospective rules to govern future conduct." *International Telephone & Telegraph Corp. v. American Telephone & Telegraph Co.*, 444 F.Supp. 1148, 1156 (S.D.N.Y.1978) (hereafter *"ITT"*). The former is afforded collateral estoppel effect; the latter is not.[11]

■ LILCO argues that the PSC was acting in a legislative, not judicial capacity, citing *Consumer Protection Board v. Public Service Commission*, 97 A.D.2d 320, 471 N.Y.S.2d 332 (3d Dep't 1983), in which the New York State Appellate Division, Third Department, denied collateral estoppel effect to findings by the PSC. In that case, however, the PSC hearings focused solely on establishing electrical rates. In contrast, the PSC proceeding regarding Shoreham focused on LILCO's prudence or mismanagement in incurring the increased costs of construction of the Shoreham facility. PSC Opinion at 1–2. Unlike the nonjudicial *ITT* proceeding, the Shoreham proceeding clearly allocated the burden of proof, *id.* at 6, specifically established a

---

**11.** *ITT* discusses two major reasons for limiting the application of collateral estoppel to adjudicative agency action. The first reason centers around procedural safeguards:

> The opportunity to present and cross-examine witnesses, a clear allocation of the burden of proof, and a clear standard against which past conduct is being measured, all of which enhance the adjudication process in resolving issues of fact, are normally either not present or materially different in non-adjudicatory agency proceedings.

*ITT* 444 F.Supp. at 1156. The second reason focuses on the differing nature of the facts relevant in these two types of proceedings:

> A legislative body is not confined to clearly defined issues of past conduct, but, rather, may properly consider a multitude of factors in determining what prospective rule will be most beneficial. As a result, rulemaking bodies do not generally make the kind of discrete factual findings of past conduct that the adjudicative process is specifically designed to provide.

*Id.* at 1158.

standard against which LILCO's conduct was measured, *id.* at 5–6, and allowed all parties to present and cross-examine witnesses, *id.* at 7. The Shoreham proceeding spanned four years, involved thousands of pages of documents and testimony, and was, in the PCS's own words, "probably the most extensively litigated record in the Commission's history." *Id.* at 5.

The PSC was vitally concerned with past conduct and assessing responsibility for any imprudence it discovered, rather than merely establishing prospective rates. After carefully examining the nature of the PSC proceeding, we believe it is the type of quasi-judicial administrative proceeding that is entitled to collateral estoppel effect. Accordingly, we next examine whether collateral estoppel should be applied as suggested by the defendant herein.

### b. Identity of Issue; Full and Fair Hearing.

 As noted earlier, the invocation of collateral estoppel requires "an identity of issue which has necessarily been decided in the prior action and ... a full and fair opportunity to contest the decision said to be controlling." *Schwartz v. Public Administrator, supra,* 298 N.Y.S.2d at 960, 246 N.E.2d 729. In considering whether a party has had a full and fair opportunity to litigate a prior determination, we examine "the forum for the prior litigation, its extensiveness, the competence and experience of counsel, the availability of new evidence, and indications of a compromise verdict." *Murphy v. Gallagher, supra,* 761 F.2d at

883. LILCO has not contested this prong of the collateral estoppel test, which, considering the length and breadth of the PSC proceedings, is hardly surprising. We find this part of the test is satisfied.

The "identicality of issue" prong is, however, contested. LILCO argues that the issue before the PSC was whether diesel-related costs were prudently incurred, whereas here, the issue is whether TDI fraudulently concealed the diesel defects. The plaintiff notes that the PSC did not decide anything about fraud, and specifically abstained from ruling on any liability TDI might have to LILCO.[12] TDI points out, however, that although the purpose of the PSC proceeding was to determine LILCO's prudence or imprudence rather than TDI's conduct, a decisive *issue* in that proceeding, as in this, was LILCO's knowledge of the alleged design defects.

 Although no single sentence in either the PSC Opinion or the ALJs' Recommended Decision sets forth a concise statement of the discrete issue TDI seeks to preclude LILCO from rearguing, a thorough reading of both decisions reveals the accuracy of TDI's position. The PSC determined that, by at least mid-1977, LILCO was aware, both directly, and through its agent,[13] Stone & Webster Engineering Corporation, of problems with the diesel stress levels and the importance of a special torsiograph test to determine whether the stress levels were acceptable. PSC Opinion at 92–98; ALJs' Recommended Decision at 119–22.[14] This finding was an essential

---

**12.** The PSC noted that its finding of mismanagement by LILCO did not absolve TDI from responsibility for the diesel failure. PSC Opinion at 100–01. This is quite true. But, if this action was not timely filed, we need not reach the issue of liability.

**13.** An agent's knowledge is imputed to its principal. *Restatement (Second) of Agency* §§ 272–282 (1958).

**14.** Some of the relevant findings made by the ALJs are excerpted below:

Stone & Webster was responsible for reviewing the torsional analysis to ensure compliance with all specification requirements. The torsional analysis disclosed on its face that the predicted vibratory stresses, within

the operating range defined by the applicable codes and standards cited in the Shoreham specifications, exceeded the maximum allowance limits.

Stone & Webster demanded, and [TDI] performed a torsiograph test in December 1975 to confirm or disprove the stress problem shown by the calculations. This test is commonly used to measure the actual stresses exerted on a crankshaft. The data from [TDI]'s torsiograph test showed that actual stresses were significantly higher than the predicted stresses, well above the allowable stress limits of the specifications, and that the crankshaft was undersized. Copies of the test and the earlier torsional analysis were sent to LILCO.

element in the PSC's determination that LILCO acted imprudently with respect to assuring that the diesel stress problems were resolved. PSC Opinion at 96–98. Consequently, we find the requirements for collateral estoppel have been met, and LILCO is precluded from rearguing the issue of when it became aware of the diesel defects. We turn, therefore, to how this finding affects the plaintiff's fraud claim.

### c. Application of PSC Finding to LILCO's Fraud Claim.

 The PSC finding that LILCO was aware of the diesel design defects by mid–1977 is a key factor in assessing the viability of LILCO's fraud claim. Although TDI may have concealed the diesel defects or misrepresented their fitness,[15] LILCO was found to have known about the diesel problems by mid–1977. Thereafter,

> However, [TDI]'s torsiograph test report did not discuss the measured stress levels. Stone & Webster never requested this information needed to ensure compliance with the specifications. . . .
>
> \* \* \* \* \* \*
>
> The actual stress values derived from the 1975 torsiograph test indicated that the crankshaft was undersized. Reasonable review by Stone & Webster would have uncovered this design flaw no later than early 1976, seven years before the crankshaft failed. . . .
>
> Stone & Webster acted as LILCO's agent for the monitoring of [TDI]'s performance under the contract between LILCO and [TDI]. LILCO, as principal, is responsible for Stone & Webster's essentially negligent failure to ensure the diesels satisfied contract requirements and specifications.
>
> If Stone & Webster was not aware of the design error in the underdesigned 11″ x 13″ Shoreham crankshaft in 1976, it became aware of the change in design in 1977, six years before the test failure in 1983.
>
> In May 1977, [TDI] supplied a torsional analysis to Stone & Webster for [another project that was using] diesel engines that were similar to those purchased for Shoreham. However, the engines for [the other project] employed 12″ x 13″ crankshafts, while the ones for Shoreham utilized the undersigned [sic] 11″ x 13″ crankshafts. [TDI] explained in the notes accompanying that analysis that a torsiograph test had been performed on the engine to check both the calculated natural frequency and the measured stress levels. . . . Accordingly, by no later than mid–1977, Stone & Webster was aware of changes in [TDI]'s 8–cylinder emergency

LILCO was no longer justified in relying on the defendant's alleged concealment of the diesel defects or misrepresentation as to their adequacy. Without the element of justifiable reliance, the plaintiff fails to state a cause of action for fraud. Thus, after mid–1977, the plaintiff can state no claim upon which relief can be granted. Any fraud prior to mid–1977, for which LILCO might have claimed, is untimely since it accrued more than six years before the filing of this complaint.[16] The plaintiff's assertion that TDI's fraudulent concealment prevented LILCO from discovering the defects until 1983 is unacceptable in the face of the PSC finding that LILCO knew about the defects by mid–1977. Therefore, giving collateral estoppel effect to this PSC finding leads inevitably to the conclusion that the plaintiff's third cause of action for fraud must be dismissed.[17]

> diesel engines and of [TDI]'s use of the torsiograph test to measure stress levels.
>
> ALJs' Recommended Decision at 119–22.

**15.** There is certainly support for the plaintiff's allegations of TDI's fraudulent concealment. For example, the PSC noted the following:

> The record indicates that [TDI] was aware of the design error, and subsequently changed its design values, and the size of its crankshafts. Rather than inform Stone & Webster or LILCO of any of these facts, [TDI] repeatedly assured Stone & Webster that the diesels were adequate. Concealing the problem with the underdesigned crankshaft, [TDI] certified . . . that the diesels met all the requirements of the specifications and that the torsiograph test had been passed successfully.

ALJs' Recommended Decision at 118. Unfortunately, this finding is of little help to the plaintiff's fraud claim if LILCO already knew about the diesel problems that TDI was allegedly concealing.

**16.** The plaintiff apparently anticipated a statute of limitations problem and attempted to circumvent it by entering into a "standstill agreement" to toll the statute of limitations on claims it might assert against TDI (or vice versa) until the conclusion of the PSC proceeding. PSC Opinion at 98–99. Unfortunately, by 1984, when the standstill agreement was made, the statute of limitations had already expired on LILCO's fraud claim, which accrued in mid–1977.

**17.** LILCO nevertheless attempts to salvage this claim by arguing that one guilty of fraud can't claim its victim's negligence as a defense. *See*

## B. *RICO*

LILCO's fourth cause of action asserts a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (1982). Section 1962(c) of RICO provides in pertinent part, that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c) (1982). TDI contends that LILCO has failed to (1) plead the requisite elements of an "enterprise" [18] and a "pattern of racketeering activity," [19] (2) plead the predicate fraudulent acts with sufficient particularity,[20] and (3) timely commence suit on this claim.

Initially, we note that since we have dismissed the plaintiff's cause of action for fraud, plaintiff also loses the predicate for its RICO claim. *See Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 18–19 (2d Cir.1983), *cert. denied sub nom. Moss v. Newman,* 465 U.S. 1025 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). Alternatively, however, the plaintiff's RICO claim is untimely.

*Angerosa v. White Co.,* 248 A.D. 425, 290 N.Y.S. 204, 211 (4th Dep't 1936). However, TDI is not asserting any negligence on LILCO's part as a defense to the substantive claim of fraud; rather, TDI claims that LILCO has simply waited too long to bring any fraud claim it might have had.

LILCO also argues that TDI should be equitably estopped from raising a statute of limitations defense. The doctrine of equitable estoppel arises when a defendant induces a plaintiff to delay instituting a lawsuit until the statute of limitations has run, by misrepresenting the time within which the plaintiff could sue. *See Glus v. Brooklyn Eastern District Terminal,* 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959). "Equitable estoppel may also arise when affirmative fraudulent statements are made which conceal from the plaintiff facts essential to make out a cause of action." *Renz v. Beeman,* 589 F.2d 735, 750 (2d Cir.1978), *cert. denied,* 444 U.S. 834, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979). *See Jordan v. Ford Motor Co.,* 73 A.D.2d 422, 426 N.Y.S.2d 359, 360 (4th Dep't 1980). However, only if a party *justifiably* relies on an alleged fraudulent misrepresentation is the statute of limitations tolled. *Curry v. A.H. Robins Co.,* 775 F.2d 212, 218–19 (7th Cir.1985); *Jordan v. Ford Motor Co., supra,* 426 N.Y.S.2d at 360. The PSC's decision shows that LILCO had sufficient knowledge of the alleged defects to make any claimed reliance on the purported concealment *un*justified.

**18.** TDI notes that "a corporate entity may not be simultaneously the 'enterprise' and the 'person' who conducts the affairs of the enterprise through a pattern of racketeering activity." *Bennett v. United States Trust Co.,* 770 F.2d 308, 315 (2d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); *see United States v. Scotto,* 641 F.2d 47, 54 (2d Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981). LILCO has named TDI as the defendant; TDI is, therefore, considered the RICO "person." *Richter v. Sudman,* 634 F.Supp. 234, 240 (S.D.N.Y.1986). The plaintiff asserts that Transamerica, Inc., TDI's parent corporation, can be considered the "enterprise," since, as a wholly-owned subsidiary, TDI necessarily acts for and on behalf of its parent. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 771, 104 S.Ct. 2731, 2742, 81 L.Ed.2d 628 (1984); *Haroco, Inc. v. American National Bank & Trust Co.,* 747 F.2d 384, 402–03 (7th Cir.1984), *aff'd* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). We need not decide whether the plaintiff has adequately pleaded this element since we find the plaintiff's RICO claim untimely in any event.

**19.** Section 1962 defines a "pattern of racketeering activity" as any of a large number of specified illegal acts, including mail and wire fraud. 18 U.S.C. § 1961(1) (1982). To properly allege a "pattern of racketeering," a complaint must allege at least two acts of racketeering. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). Merely listing a series of acts or incidents of illegal conduct will not establish a pattern where the acts complained of comprise a single transaction. *Richter v. Sudman, supra,* 634 F.Supp. at 239. LILCO's allegation of a series of representations made to it by TDI is but a single transaction. The further allegation that TDI distributed misleading information to other nuclear customers is seriously flawed in terms of pleading fraud with particularity. *See Terra Resources I v. Burgin,* [Current Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 92,703 (S.D.N.Y. April 3, 1986); *Mauriber v. Shearson/American Express, Inc.,* 546 F.Supp. 391, 394 (S.D.N.Y.1982), *cited with approval in Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 19 (2d Cir.1983), *cert. denied sub nom. Moss v. Newman,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

**20.** As mentioned in note 19, *supra,* the plaintiff's allegations of TDI's fraud on other nuclear customers are not stated with great particularity. However, we need not rule on the sufficiency of the pleading since we find this cause of action untimely.

In considering the timeliness of the plaintiff's RICO claim, we first examine when it accrued. The question of when a limitations period begins to run is governed by federal law. *Rawlings v. Ray,* 312 U.S. 96, 98, 61 S.Ct. 473, 474, 85 L.Ed. 605 (1941). We believe that "the general federal rule, which provides that the statute of limitations begins to run when a plaintiff *knows or should know of the injury,* applies in civil RICO cases." *Bowling v. Founders Title Co.,* 773 F.2d 1175, 1178 (11th Cir.1985), *cert. denied sub nom. Zoldessy v. Founders Title Co.,* — U.S. —, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1986) (emphasis added). The plaintiff contends that it discovered its injury in 1983. However, as previously discussed, a prior proceeding conclusively determined that LILCO was aware of the diesel defects by mid–1977. In giving this finding collateral estoppel effect, *see supra* pp. 1451–52, we must reject LILCO's contention that it remained ignorant of its injury until 1983. Thus, we find that the statute of limitations on LILCO's RICO claim began to run by mid–1977.

The RICO statute does not specify the time within which civil RICO claims must be brought. In these circumstances, courts have looked to analogous state statutes of limitations, *see Durante Bros. and Sons, Inc. v. Flushing National Bank,* 755 F.2d 239, 248 (2d Cir.1983), *cert. denied,* — U.S. —, 105 S.Ct. 3530, 87 L.Ed.2d 654 (1985); *Fustok v. ContiCommodity Services, Inc.,* 618 F.Supp. 1076, 1080–81 (S.D.N.Y.1985), and, in some instances, analogous federal limitations periods. *See Del-Costello v. International Brotherhood of Teamsters,* 462 U.S. 151, 172, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); *Bartels v.*

*Clayton Brokerage Co.,* 631 F.Supp. 442, 449 (S.D.N.Y.1986). A number of courts have recently favored applying a single state statute of limitations to all civil RICO actions brought in a particular jurisdiction. *See, e.g., Malley-Duff & Associates v. Crown Life Insurance Co.,* 792 F.2d 341, 349 (3d Cir.1986); *Hunt v. American Bank & Trust Co.,* 783 F.2d 1011, 1014 n. 4 (11th Cir.1986); *Bankers Trust Co. v. Feldesman,* 65 B.R. 470, (S.D.N.Y.1986).[21] We need not speculate upon what approach the Second Circuit might adopt, since even New York's six-year limitations period[22] is insufficient to save LILCO's RICO claim.

Since the limitations period on the plaintiff's RICO claim began to run in mid–1977, it expired long before this action was filed in August 1985. Consequently, LILCO's RICO claim is time barred, and TDI's motion to dismiss the fourth cause of action is granted.

### C. Contract and Warranty

LILCO's fifth cause of action alleges TDI's breach of contract. Since the contract between LILCO and TDI was for the purchase and sale of the diesels, it falls within the ambit of Article 2 of the Uniform Commercial Code. Pursuant to that statute, an action for breach of a sales contract must be brought within four years of the date on which it accrues, that is, when the breach occurs. N.Y.U.C.C. § 2–725(1) (McKinney 1964). A sales contract is breached when nonconforming goods are delivered, regardless of whether the purchaser is aware of the breach at that time. *Id.* at § 2–725(2). *See Constable v. Colonie Truck Sales, Inc.,* 37 A.D.2d 1011, 325 N.Y.S.2d 601, 602 (3d Dep't 1971). The diesels were delivered to LILCO in 1976.[23]

---

21. These decisions rely on analogous reasoning by the Supreme Court in *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), in which the Court selected a single state limitations period for all claims brought under 42 U.S.C. § 1983.

22. New York has several limitations statutes that could be borrowed for a RICO claim: a six-year statute of limitations for fraud, N.Y.Civ. Prac.Law & R. § 213(8) (McKinney 1972 &

Supp.1986), a three-year period for "an action to recover upon a liability, penalty or forfeiture created or imposed by statute," *id.* at § 214(2), or a six-year period for "an action for which no limitation is specifically prescribed by law." *Id.* at § 213(1).

23. The complaint fails to allege the delivery date. However, as TDI points out, this omission cannot be relied upon to defeat a motion to

This action was filed in 1985. Accordingly, LILCO's fifth cause of action for breach of contract is untimely.

■ LILCO's sixth, seventh, eighth, and ninth causes of action state a variety of breach of warranty claims, which are also governed by the U.C.C. and its four-year statute of limitations. TDI argues that these claims, like the plaintiff's breach of contract claim, are untimely.

As a general rule, "[a] breach of warranty occurs when tender of delivery is made." N.Y.U.C.C. § 2–275(2) (McKinney 1964). LILCO contends that "tender of delivery" was made not in 1976 when the diesels were shipped to Shoreham, but rather in 1981 when they were finally installed. This is because the diesels were stored for a lengthy period of time prior to installation, and TDI had continuing responsibility for supervising the installation. In support of this argument, LILCO cites *City of New York v. Pullman Inc.*, 662 F.2d 910 (2d Cir.1981), *cert. denied sub nom. Rockwell International Corp. v. City of New York*, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982). In *Pullman*, the City contracted for the purchase of 754 subway cars. Pursuant to the contract, ten subway cars were delivered for on-line testing and inspection to see that they conformed to the contract prior to completion and delivery of the remaining cars. The *Pullman* court found that delivery of the first ten cars did not constitute "tender of delivery" of the entire order for purposes of establishing when a cause of action accrued. *Id.* at 919.

We find the *Pullman* case inapposite here. Unlike the defendant in *Pullman*, TDI delivered the entire order of three diesels in 1976. Moreover, the TDI/LILCO contract contained no provision that the goods be tested to assure conformance with the contract before delivery was complete. Section 2–503 of the U.C.C. notes that "[t]ender of delivery requires that the seller put and hold conforming goods at the buyer's disposition...." However, even tender of *non* conforming goods is considered delivery. *Uchitel v. F.R. Tripler &*

Co., 107 Misc.2d 310, 434 N.Y.S.2d 77, 80 (App.Term 1980). In this case, "tender" coincided with actual delivery of the diesels in 1976. LILCO's warranty claims, filed more than four years after delivery, are untimely, unless saved by the exception of section 2–275(2), whereby if a warranty extends to future performance "and discovery of the breach must await the time of such performance the cause of action accrues when a breach is or should have been discovered." N.Y.U.C.C. § 2–275(2) (McKinney 1964).

The sixth cause of action alleges a breach of warranty that the diesels would "be free from defects in design, workmanship and material and shall be suitable for their intended purpose." Complaint ¶ 81. This warranty of merchantability is a *present* warranty, a breach of which occurs upon delivery of the goods. *See Mittasch v. Seal Lock Burial Vault, Inc.*, 42 A.D.2d 573, 344 N.Y.S.2d 101, 102 (2d Dep't 1973); *Constable v. Colonie Truck Sales, Inc.*, *supra*, 325 N.Y.S.2d at 602. LILCO's sixth cause of action accrued when the diesels were delivered in 1976. It is, therefore, untimely and must be dismissed.

The seventh cause of action alleges that the warranty of merchantability (count six) impliedly includes a promise to repair or replace the diesels if defective, and that TDI continues to breach this warranty. However, as part of the express warranty of merchantability, this implied warranty was also breached, if at all, upon delivery. If, for argument's sake, we view this claim as one for breach of a future warranty to repair and replace, it is duplicative of count nine and, in either event, must be dismissed.

LILCO contends that its eighth cause of action pleads a breach of warranty of future performance. The contract clause states, "After all required tests have been made, the Seller shall warrant that the equipment will achieve the warranted performance stated in the specification when operating at the design conditions listed in the specification." Complaint ¶ 89. If a

dismiss. At oral argument, LILCO admitted

that the diesels were delivered in 1976.

warranty explicitly extends to future performance, it will fall within the exception of U.C.C. § 2–275(2). Although the above-quoted contract clause does not state exactly when the required tests were to be made, if we assume that some of these were to be performed after delivery, this warranty could be interpreted as one for future performance. However, even as such, LILCO's eighth cause of action is untimely.

 A claim for breach of a warranty of future performance accrues "when the breach *is or should have been discovered.*" U.C.C. § 2–275(2) (emphasis added). *See Gemini Typographers, Inc. v. Mergenthaler Linotype Co.,* 48 A.D.2d 637, 368 N.Y.S.2d 210, 212 (1st Dep't 1975); *Mittasch v. Seal Lock Burial Vault, Inc., supra,* 344 N.Y.S.2d at 102. We previously determined that collateral estoppel effect should be given to the PSC finding that LILCO knew about the diesel defects by mid–1977, *see supra* pp. 1451–52. Knowledge of the defects is tantamount to knowledge of a breach, since the defective diesels did not meet the contract specifications. Consequently, the limitations period on this claim began to run in mid–1977. LILCO's eighth cause of action was untimely when filed in August 1985 and must be dismissed.

 This leaves the ninth cause of action in which the plaintiff asserts that

TDI breached an express future warranty to repair and replace.[24] We find that this claim survives the defendant's motion to dismiss. Unlike a warranty of future performance, a breach of which arises when the plaintiff should have discovered the breach, an express promise to repair or replace arises when the equipment malfunctions. *Shapiro v. Long Island Lighting Co.,* 71 A.D.2d 671, 418 N.Y.S.2d 948, 950 (2d Dep't 1979). Paragraph 94 of the complaint states a claim for breach of promise to repair the diesels if they fail to achieve warranted performance in place. This could not accrue until the diesels were installed and failed to perform. The diesels were not completely installed until October 1981.[25] Preoperational testing was completed in June 1983, and the crankshaft failure occurred in August 1983. This action was filed in August 1985, less than four years after installation and two years after a specific malfunction that required repair or replacement of the diesels. Thus, LILCO's ninth cause of action for breach of promise to repair or modify the diesels to achieve warranted performance in place is timely, and we deny TDI's motion to dismiss this claim.[26]

### D. *Negligence and Strict Products Liability*

LILCO's tenth cause of action asserts a claim for strict products liability. Several

---

**24.** The complaint quotes the following contract provision:

"In the event the equipment fails to achieve the warranted performance in place, then, to the extent that the deficiency or failure to achieve warranted performance is attributable to equipment supplied by Seller, Seller shall make such adjustments or modifications to enable the equipment to achieve warranted performance. The costs of these adjustments and modifications shall be for Seller's account. After such adjustments or modifications, should the equipment fail to achieve warranted performance, an equitable adjustment shall be made, which may without limitation include an adjustment in the purchase order price."

Complaint ¶ 94.

**25.** Although the complaint fails to specify the installation date, LILCO provides this informa-

tion in an affidavit in opposition to the defendant's motion to dismiss. *See* Museler Affidavit at ¶ 44.

**26.** Of course, the parties strenuously disagree as to whether TDI made the needed repairs when the diesels malfunctioned. They also dispute the period of time during which this express warranty to make adjustments or modifications was to be in effect. LILCO contends that the contract with TDI called for warranties to run for one year after Shoreham achieved commercial operation. TDI asserts that, once it became apparent that Shoreham might not achieve commercial operation for many years, it advised LILCO that the diesel warranties would expire unless renewed. They were not renewed. We do not address these factual issues at present, but find only that the claim stated in LILCO's ninth cause of action should not be dismissed on statute of limitations grounds.

other causes of action assert negligence claims in one form or another: the first cause of action alleges negligent failure to warn; the second cause of action alleges negligent failure to perform services under a contract; and the eleventh cause of action alleges negligent design, manufacture, and testing of the diesels. One or more of these "negligence" claims may more properly state a cause of action for breach of contract. However, accepting them as negligence claims for the moment, we find that none can survive TDI's motion to dismiss.

TDI attacks LILCO's negligence and strict liability causes of action on two grounds. It argues that these tort claims are barred by the applicable statute of limitations, and that LILCO fails to state a cause of action in either negligence or strict products liability because the only damages alleged are for economic loss.

■ An action in negligence or strict products liability seeks to redress injuries to persons or property. When compensation is sought for purely economic loss, the usual means of redress is an action for breach of contract, to give the parties the benefit of their bargain. *See County of Suffolk v. Long Island Lighting Co.*, 728 F.2d 52, 63 (2d Cir.1984). "New York law holds that a negligence [or strict products liability] action seeking recovery for economic loss will not lie." *Id.* at 62; *see Antel Oldsmobile-Cadillac, Inc. v. Sirus Leasing Co.*, 101 A.D.2d 688, 475 N.Y.S.2d 944, 945 (4th Dep't 1984); *Mid-Hudson Mack, Inc. v. Dutchess Quarry & Supply Co.*, 99 A.D.2d 751, 471 N.Y.S.2d 664, 666–67 (2d Dep't 1984).

■ LILCO attempts to circumvent the New York law proscribing actions in tort for purely economic loss by arguing that the unreasonably dangerous nature of the defective diesels created a public safety hazard and that this grave risk dictates a tort remedy that includes economic loss. This approach is analogous to an argument used against LILCO in *County of Suffolk v. Long Island Lighting Co., supra, i.e.,* "that the unreasonably dangerous nature of a nuclear power plant creates a substantial likelihood of future injury on a grand scale and that this amounts to more than economic injury." *Id.* 728 F.2d at 62. That court, however, rejected such a speculative damage claim, noting that,

> the fact remains that this complaint does not allege an injury to person or property and therefore does not state a cause of action for negligence.
>
> Similar reasoning applies to [plaintiff's] allegations of strict liability. The nature of strict products liability is to permit recovery for personal injury or property damage caused by a manufacturer's unreasonably dangerous product. *Codling v. Paglia*, 32 N.Y.2d 330, 340–41, 298 N.E.2d 622, 345 N.Y.S.2d 461 (1973).... But where plaintiff's claim is simply that the product did not function properly, requiring its owner to incur costs of repair, then the only injury claimed is one for economic loss, ...

*Id.*

Here, despite the plaintiff's allegation of potential harm or risk to the public, the only actual "injury" was to the diesels themselves. The resulting damages were merely the direct and indirect economic loss involved in restoring the diesels to operational functioning. Accordingly, under New York law, the plaintiff has failed to state a cause of action in tort.[27]

---

**27.** The New York Appellate Division, First Department, recently allowed a claim in strict products liability and/or negligence for economic loss against the manufacturer of an allegedly defective product. *See Trustees of Columbia University v. Exposaic Industries, Inc.*, —— A.D.2d ——, 505 N.Y.S.2d 882 (1st Dep't 1986). The situation in *Columbia University*, however, is distinguishable from the instant case. There, the manufacturer had supplied material used in the outer wall of a building on a college campus. The wall was at the point of imminent collapse due to the allegedly defective material. These facts led the New York court to conclude that the material constituted an unreasonably dangerous product, for which the manufacturer "would be liable in damages under strict products liability and/or negligence, for physical injuries to plaintiff's property, including the wall itself, proximately caused by such defective material." *Id.* at 884. In *Columbia University*, the dangerous condition was real, not specula-

Moreover, LILCO's negligence and strict products liability claims are untimely. Since LILCO knew about the diesel defects by mid–1977, *see supra* pp. 1451–52, it also should have known of its purported tort injury. The statute of limitations on such claims expired long before LILCO filed this action in 1985. *See* N.Y.Civ. Prac.Law & R. § 214(4) (McKinney 1972) (three-year statute of limitations on claims for injury to property). We therefore grant the defendant's motion to dismiss the plaintiff's first, second, tenth, and eleventh causes of action on both of these grounds.

### E. *Consequential Damages*

TDI contends that LILCO should be precluded from recovering consequential damages on any claim because the parties' contract provides that "under no circumstances shall [TDI] be liable for special or consequential damages." Defendant's Memorandum of Law in Support of Motion to Dismiss at 68. Consequential damages are defined as "(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and (b) injury to person or property proximately resulting from any breach of warranty." N.Y.U.C.C. § 2–715(2) (McKinney 1964). The Uniform Commercial Code permits the parties to a sales contract to provide specific remedies, *id.* at § 2–719(1), and to limit or exclude consequential damages "unless the limitation or exclusion is unconscionable." *Id.* at § 2–719(3). Limitations of consequential damages in commercial, as opposed to consumer, transactions are rarely considered unconscionable. *Id.*

The plaintiff does not allege that the limitation of consequential damages is unconscionable per se. Rather, LILCO has

alleged that TDI's wrongdoing should preclude it from the protection of that contract provision. A defendant may be estopped from asserting a contractual limitation of consequential damages if the defendant has acted in bad faith. *See County Asphalt, Inc. v. Lewis Welding & Engineering Corp.*, 323 F.Supp. 1300, 1308 (S.D.N.Y.1970), *aff'd*, 444 F.2d 372 (2d Cir.), *cert. denied*, 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971); *Jones & McKnight Corp. v. Birdsboro Corp.*, 320 F.Supp. 39, 43 (N.D.Ill.1970).

LILCO points to TDI's concealment of the diesel defects as evidence of the defendant's bad faith.[28] Since the plaintiff's only remaining cause of action is for breach of a future warranty to repair or replace the defective diesels, the question is whether, if TDI breached this warranty, it did so in bad faith. The plaintiff contends that TDI totally repudiated its obligations under this warranty. Consequently, says LILCO, this limited contractual remedy has failed of its essential purpose, leaving LILCO free to pursue any remedy provided by the Uniform Commercial Code, without regard to other contractual limitations. *See* U.C.C. § 2–719(2). This argument was made and rejected in *American Electric Power Co. v. Westinghouse Electric Corp.*, 418 F.Supp. 435 (S.D.N.Y.1976). The court noted that "where an exclusive remedy (such as a warranty to repair and replace) fails of its essential purpose, it may be ignored, and other clauses in the contract which limit remedies for breach may be left to stand or fall independent of the stricken clause." *Id.* at 458. *See County Asphalt, Inc. v. Lewis Welding & Engineering Corp., supra*, 323 F.Supp. at 1309. In other words, if the plaintiff shows that the warranty to repair

---

tive, because tiles were falling from the defective wall and had actually injured persons walking on the school campus. No similar immediate threat to persons or property is present in the instant suit. The diesel problems were uncovered and repaired during preoperational testing. LILCO has yet to attain the necessary operating license to bring Shoreham on line. Thus, the diesels are not an imminent threat to public safety and are surely not the kind of "unreasonably dangerous product" envisioned by the court in *Columbia University*.

**28.** *See supra* note 15.

or replace has failed of its essential purpose, it may pursue other remedies available under the U.C.C., such as direct and incidental damages,[29] but not necessarily consequential damages. Since the contractual exclusion of consequential damages is not unconscionable on its face, it may only be circumvented upon a showing that the defendant's conduct bars it from invoking the shield of this damage limitation. *See id.* at 1308. The question of TDI's alleged bad faith raises a factual issue that cannot be resolved on the instant motion and is, therefore, reserved for trial of the plaintiff's remaining warranty claim.[30]

## CONCLUSION

The defendant's motion to dismiss the complaint on grounds of judicial estoppel is denied. Collateral estoppel effect will be afforded to findings of the Public Service Commission regarding LILCO's knowledge of the diesel defects, but will not be afforded to findings of the Atomic Safety and Licensing Board. The defendant's motion to dismiss is granted as to all counts of the complaint except count nine, which alleges breach of an express future warranty to repair or replace the diesels. The issue of whether the parties' contractual limitation on consequential damages should be given effect is reserved for trial on the merits of the remaining cause of action.

SO ORDERED.

---

**29.** Incidental damages include "any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." U.C.C. § 2–715(1). Assuming that the plaintiff prevails on its claim of breach of warranty, it will be entitled to "at least a fair quantum of remedy for breach." U.C.C. § 2–719, Official Comment 1.

**30.** The complaint sets forth a plea for damages including, but not limited to, the following:
(a) the purchase price that LILCO paid TDI for the Diesel Generators which, as originally supplied, were defective and nonconforming;
(b) the costs incurred in investigating the cause of and remedy for the defects in the Diesel Generators;
(c) the costs of repairing and testing the Diesel Generators;
(d) increased licensing costs, including legal expenses, occasioned by the defects in the Diesel Generators;
(e) increased costs and expenses to construct and operate Shoreham caused by the delays resulting from the defects in the Diesel Generators;
(f) costs of purchasing, designing, constructing and testing alternative diesel generators for use for full power operation (the Colt Diesels), and associated buildings and equipment in the event that the TDI diesels could not be licensed for all or part of Shoreham's operating life and the costs of purchasing, installing, designing, testing, and licensing alternative emergency AC power sources for use during low power operation of Shoreham, all of which costs were incurred to avoid delay in operation of Shoreham and other potential damages to LILCO arising out of the defects in the Diesel Generators;
(g) costs of defending allegations concerning the Diesel Generators made by the Staff of the New York Public Service Commission and adjudicated before the New York Public Service Commission and penalties assessed against LILCO by the New York Public Service Commission as a direct result of the defects in the Diesel Generators; and
(h) costs of future testing, inspections, nondestructive examinations and monitoring required to ensure the reliability and operability of the Diesel Generators as repaired.
Complaint § 25. We reserve for trial the question of whether the plaintiff's claimed damages should be characterized as direct, incidental, or consequential. *See American Electric Power Co. v. Westinghouse Electric Corp.,* 418 F.Supp. 435, 459 (S.D.N.Y.1976) ("the precise demarcation between direct and consequential damages is a question of fact"). We note, however, that since the only remaining claim is for breach of a future warranty to repair or replace the defective diesels, we will consider only those damages that flow from such a breach, whether direct, incidental, or consequential (if allowed).