6 F.3d 876
 RICO Bus.Disp.Guide 8457, 22 UCC Rep.Serv.2d 205
 LONG ISLAND LIGHTING COMPANY, Plaintiff-Appellant-Cross-Appellee,
v.
IMO INDUSTRIES INC., Defendant-Appellee-Cross-Appellant,
and
Stone & Webster Engineering Corp., Defendant-Appellee.
 Nos. 768, 1467, Dockets 92-7773, 92-7893.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 7, 1993.
Decided Sept. 22, 1993.
 
 Robert M. Rolfe, New York City (W. Taylor Reveley, III, Franklin H. Stone, Christopher M. Mason, Hunton & Williams, New York City, Robert J. Grey, General Counsel, Long Island Lighting Co., Hicksville, NY, of counsel), for plaintiff-appellant-cross-appellee.
 Robert E. Smith, New York City (Joseph Zuckerman, David E. Ross, Richard F. Bernstein, Donna L. LaMagna, Rosenman & Colin, James W. Quinn, Weil, Gotshal & Manges, of counsel), for defendant-appellee-cross-appellant.
 Laurence V. Senn, Jr., New York City (Judith A. Lockhart, Dennis M. Walsh, Mudge Rose Guthrie Alexander & Ferdon, of counsel), for appellee.
 William J. Cowan, Gen. Counsel, Public Service Com'n of State of N.Y., Albany, NY (Diane T. Dean, Asst. Counsel, Public Service Com'n of State of N.Y., of counsel), for amicus curiae Public Service Com'n of the State of N.Y.
 Before: PRATT, MAHONEY, and FRIEDMAN,* Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 Plaintiff-appellant-cross-appellee Long Island Lighting Co. ("LILCO") appeals from a final judgment entered July 22, 1992 in the United States District Court for the Southern District of New York, Richard Owen, Judge. After a bifurcated jury trial, defendant-appellee-cross-appellant Imo Industries Inc.[1] was held liable for $10,809,806 in damages and $7,569,530.71 in prejudgment interest stemming from a breach of its promise to repair defective diesel generators sold to LILCO. In three earlier opinions, seeLILCO v. Transamerica Delaval, Inc. ("LILCO I"), 646 F.Supp. 1442 (S.D.N.Y.), reargument and certification denied, holding clarified, 648 F.Supp. 988 (S.D.N.Y.1986) ("LILCO II"); LILCO v. Imo Delaval, Inc. ("LILCO III"), 668 F.Supp. 237 (S.D.N.Y.1987), the district court, Gerard L. Goettel, Judge, dismissed LILCO's other claims asserted in its original and amended complaints against Imo, and LILCO's complaint against defendant-appellee Stone & Webster Engineering Corp. ("SWEC").
 
 
 2
 LILCO appeals the district court's dismissal of its complaint against SWEC and the district court's dismissal of its claims against Imo, with the exception of its cause of action for Imo's breach of its repair obligation, as well as the district court's limitation of the damages that it could recover from Imo. See LILCO v. Imo Indus., ("LILCO VII"), No. 85 Civ. 6892 (RO) (S.D.N.Y. Mar. 30, 1992) (memorandum limiting damages). Imo cross-appeals, contending that the district court should have dismissed as untimely LILCO's claim that Imo breached its undertaking to repair the defective generators.
 
 
 3
 We affirm.
 
 Background
 
 4
 In 1965, LILCO initiated plans to construct a nuclear power plant at Shoreham, Long Island ("Shoreham" or the "Shoreham Plant"). The Nuclear Regulatory Commission ("NRC") required that the plant include a reliable, independent onsite power source capable of running the cooling and various other systems necessary to assure the safe shutdown of the reactor in case of emergency. Pursuant to a June 1, 1967 contract (as amended May 1, 1973, December 11, 1978, and March 13, 1984) with LILCO, SWEC was responsible for, inter alia, preparing performance specifications for the emergency generators and assuring that the generators were supplied in accordance with the specifications.
 
 
 5
 In December 1973, LILCO invited Imo to bid on the design, manufacture, and supply of three emergency diesel generators (the "Generators") for the Shoreham Plant. LILCO issued a purchase order on May 20, 1974 awarding Imo the contract to manufacture the Generators for a purchase price of $2,110,000. The purchase order incorporated by reference LILCO's invitation to bid, the specifications for the Generators, Imo's proposal, and numerous letters and telexes.
 
 
 6
 Imo warranted (until one year after Shoreham's initial operation) that the Generators would achieve their warranted performance in place, and agreed that if they did not, "to the extent that the deficiency or failure to achieve the warranted performance is attributable to equipment supplied by [Imo], [Imo] shall make such adjustments or modifications to enable the equipment to achieve the warranted performance." The contract also provided that "under no circumstances shall [Imo] be liable for special or consequential damages, including the loss of profit or use of any part or all of [LILCO's] facilities," and that Imo's liability "shall not in any case exceed the cost of correcting defects in the [Generators]."
 
 
 7
 During the manufacture of the Generators and prior to their delivery to LILCO, Imo allegedly learned that the solid steel crankshafts, whose main journals had a thirteen-inch diameter and whose eight crankpins had an eleven-inch diameter, could not withstand their anticipated torsional stresses and accordingly did not meet the contract specifications. Imo assertedly redesigned its generators, incorporating larger crankshafts, for sales to other parties, but did not alter the crankshafts on the Generators, and did not notify LILCO of the design error. LILCO further alleged that through 1983, Imo made continuing representations that the crankshafts which it supplied to LILCO were adequate to meet the specified standards.
 
 
 8
 LILCO accepted delivery of the three Generators in 1976 and 1977. The Generators were placed in storage upon delivery until the Shoreham Plant was ready for their installation and testing, which began in 1981. Both Imo and LILCO were aware that the Generators would be stored for a period of time prior to their installation. SeeLILCO I, 646 F.Supp. at 1445 n. 1.
 
 
 9
 Numerous problems with the Generators occurred when field testing was subsequently undertaken. LILCO and Imo worked together to address these difficulties, but Imo insisted that it had no contractual obligation to do so. As a result, LILCO paid Imo over one million dollars for replacement parts and services necessitated by the various failures that occurred throughout the two-year period immediately following initial installation.
 
 
 10
 The failures culminated on August 12, 1983, when one of the crankshafts snapped in half and severe cracks were discovered in the two remaining crankshafts. LILCO claims that at this juncture, it believed it could no longer reasonably rely on Imo to make the Generators operable. LILCO therefore hired various groups of outside consulting engineers, including SWEC engineers, assigned LILCO employees, and procured union craft labor to assist in repairing the Generators. Repair of the crankshafts required LILCO to disconnect the Generators from the electrical and piping connections; move them to another location where they were totally disassembled, inspected, tested, and reassembled; and return and reconnect them for additional performance tests. By the end of 1983, LILCO's outside consultants determined that the crankshafts had failed because they were inadequately sized, and that larger replacement crankshafts would resolve the problem.
 
 
 11
 In the midst of the repair effort, the NRC Staff became skeptical that Imo generators were adequate for nuclear plants because of widespread problems with Imo generators at a number of nuclear plants, including Shoreham, and announced that it would not license plants using Imo generators unless there was an assurance of the generators' reliability. SeeLILCO v. Imo Indus. ("LILCO IV"), No. 85 Civ. 6892 (RO), slip op. at 3-4, 1990 WL 64588 (S.D.N.Y. May 3, 1990). In response to these concerns, LILCO joined with owners of other affected nuclear plants to establish an owners' group to develop a comprehensive plan to establish the reliability of Imo generators (the "Owners' Group"). The NRC Staff approved the Owners' Group program in January 1984 and awaited its results.
 
 
 12
 By September 1983, only two issues remained before Shoreham could be licensed: (1) the certification of the Imo generators, and (2) emergency evacuation planning for the plant. See In re LILCO (Shoreham Nuclear Power Station, Unit 1), 18 N.R.C. 445, 623-24 & n. 71, 634 (1983). LILCO claims that it feared the lack of qualified emergency generators could independently delay Shoreham's commercial operation, which would result in delay costs of over one million dollars a day, and was concerned that the Imo generators might never be successfully repaired.
 
 
 13
 To address this situation, in September 1983 LILCO ordered three Colt emergency generators at a cost of thirteen million dollars whose delivery was expected in the spring of 1984. LILCO asserts that the Colt generators were chosen in part because they were able to fit into the housing designed for the Generators. In December 1983, however, based upon the reports of its outside engineers, LILCO determined that it was not likely to abandon the Generators, and it therefore decided to construct a new building to house the standby Colt generators. The ultimate cost for the Colt generators and housing was approximately $126 million. LILCO spent approximately another four million dollars in other efforts to expedite the issuance of a low power testing license despite the problems with the Generators.
 
 
 14
 The district court found that "LILCO had no immediate or imminent need for the Colts, ... [and] it ordered them as an 'insurance policy.' " LILCO IV, slip op. at 3. Furthermore, despite its ultimate decision not to replace the Generators, LILCO never exercised a cancellation clause contained in the Colt contract. Id. at 4.
 
 
 15
 The repairs and "alternative emergency power" equipment were paid out of LILCO's general pool of Shoreham equity and debt financing. Financing costs were measured by the utility accounting formula known as Allowance for Funds Used During Construction ("AFUDC"). AFUDC is a cost allocation device through which a utility's costs relating to plant constructions are identified and segregated. See generallyGreenapple v. Detroit Edison Co., 618 F.2d 198, 200-02 (2d Cir.1980).
 
 
 16
 Further problems arose in the course of placing the Generators into operation. These problems were eventually resolved, and in late 1984, a "long duration" test required by the NRC was performed. On June 14, 1985, the NRC Atomic Safety and Licensing Board determined that the Generators were "acceptable, for the first fuel cycle, to supply emergency electrical power" to Shoreham, and authorized the issuance to LILCO of a license for "low power testing (up to 5 percent of rated power)" at Shoreham. In re LILCO (Shoreham Nuclear Power Station, Unit 1), 21 N.R.C. 1637, 1637, 1705 (1985). However, Shoreham never became commercially operational. LILCO ultimately entered into an agreement to transfer Shoreham to New York State, which is currently in the process of dismantling the plant. See generally In re Citizens for an Orderly Energy Policy, Inc., v. Cuomo, 78 N.Y.2d 398, 406-09, 582 N.E.2d 568, 570-71, 576 N.Y.S.2d 185, 187-88 (1991).
 
 
 17
 The crankshaft failures and related costs came under scrutiny by the Public Service Commission of New York State (the "PSC") as part of an investigation that it conducted regarding the increased costs and delays in the construction of Shoreham. In May 1979, the PSC initiated a proceeding (the "Prudence Proceeding") to determine whether and to what extent "the incurred cost of the Shoreham facility exceed[ed] the reasonable and prudent cost of such a facility because of LILCO's imprudence, mismanagement or gross inefficiency," and accordingly "to allocate Shoreham costs between ratepayers and shareholders." The Prudence Proceeding was an adversarial proceeding between LILCO on one side, and the PSC staff and various intervenors, including Suffolk County, Nassau County, the New York State Consumer Protection Board, and New York State, on the other.
 
 
 18
 In March, 1985, the two administrative law judges conducting the Prudence Proceeding issued their recommended decision. With respect to the Generators, the judges concluded that:
 
 
 19
 The actual stress values derived from the 1975 torsiograph test indicated that the crankshaft was undersized. Reasonable review by [SWEC] would have uncovered this design flaw no later than early 1976, seven years before the crankshaft failed. The diesel generator failure, repairs, replacements and delay which began in 1983, and continue to the present are due to inadequate management oversight for which LILCO is responsible as owner and licensee of the Shoreham project.
 
 
 20
 [SWEC] acted as LILCO's agent for the monitoring of [Imo's] performance under the contract between LILCO and [Imo]. LILCO, as principal, is responsible for [SWEC's] essentially negligent failure to ensure the diesels satisfied contract requirements and specifications.
 
 
 21
 If [SWEC] was not aware of the design error in the underdesigned 11" X 13"' Shoreham crankshaft in 1976, it became aware of the change in design in 1977, six years before the design failure in 1983.
 
 
 22
 In May 1977, [Imo] supplied a torsional analysis to [SWEC] for Gulf States Utilities' River Bend project. Gulf States had purchased R-48 diesel engines that were similar to those purchased for Shoreham. However, the engines for River Bend employed 12" X 13" crankshafts, while the ones for Shoreham utilized the under[de]signed 11" X 13" crankshafts. [Imo] explained in the notes accompanying that analysis that a torsiograph test had been performed on the [Gulf States] engine.... Accordingly, by no later than mid-1977, [SWEC] was aware of changes in [Imo's] 8-cylinder emergency diesel engines and of [Imo's] use of the torsiograph test to measure stress levels.
 
 
 23
 We conclude, based on the contemporary documentary evidence, that reasonable management oversight and review would have revealed the crankshaft design error and that failure to do so constitutes imprudence chargeable to LILCO.
 
 
 24
 The administrative law judges determined that approximately $1.2 billion of LILCO's Shoreham costs, including approximately $494 million attributable to the problems with the Generators, had been imprudently incurred and should be excluded from LILCO's rate base. Their recommended decision was substantially affirmed by the PSC on December 16, 1985, with a modification not pertinent to this appeal. Both in its opinion and in its amicus brief on this appeal, however, the PSC specifically noted that its proceedings "[did] not absolve either [SWEC] or [Imo] in other forums from responsibility for the [Generators'] failure, because the issue in this proceeding is whether a flaw which constituted a design defect could have been discovered earlier if the procurement process had been managed responsibly."
 
 
 25
 LILCO sought judicial review of the PSC's decision, and the Appellate Division, Third Department, while modifying the PSC's ruling in one respect not relevant here, affirmed with respect to LILCO's responsibility for the Generators' failure, stating:LILCO was held responsible for the [Generators'] failure. The record evidence is that the [Generators] failed because their crankshafts were not designed for the use to which they were to be put. [SWEC] was aware that this was a potential problem, yet neglected to adequately oversee tests that it had requested to resolve its concerns.
 
 
 26
 ... It is the utility that is beholden to its ratepayers for a judicious investment of its resources, and that obligation cannot be shirked by entrusting it to agents or independent contractors and then blindly relying on them. Consequently, [Imo's] purported deception is simply not relevant in these proceedings, for the PSC's determination is not directed at allocating liability between [Imo] and LILCO, but at separating costs to be borne by LILCO's shareholders and ratepayers, respectively.
 
 
 27
 Furthermore, there is creditable evidence in the record that LILCO itself acted incautiously with regard to its acquisition of the [Generators].... Having selected the least experienced manufacturer, LILCO then did nothing to ensure compliance with the contract and when a fundamental test of the crankshaft, beyond that called for in the contract, was required, LILCO remained oblivious to the purpose for and results of the test.
 
 
 28
 LILCO v. Public Service Comm'n, 134 A.D.2d 135, 147-48, 523 N.Y.S.2d 615, 622-23 (3d Dep't 1987) (footnote and citations omitted). LILCO has subsequently sought, unsuccessfully, to have the Appellate Division, Third Department vacate both the PSC opinion and the Appellate Division opinion as moot, based upon the agreement with New York State closing Shoreham.
 
 
 29
 In August 1985,[2] LILCO filed its original complaint in this action. Invoking diversity jurisdiction pursuant to 28 U.S.C. Sec. 1332 (1988), LILCO alleged in eleven counts that Imo: (1) failed to warn LILCO about known defects in the Generators; (2) negligently failed to perform required engineering services and testing; (3) fraudulently concealed defects and misrepresented the condition of the Generators; (4) violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Sec. 1961 (1988 & Supp. II 1990) et seq., through the use of the mail or wires to defraud LILCO concerning the defective Generators; (5) breached its contract by supplying defective Generators; (6) breached its warranty that the Generators would be free from defects in design, workmanship, and material and suitable for their intended purpose; (7) breached its promise to repair or replace in connection with the above warranty; (8) breached its warranty that the Generators would achieve warranted performance in place; (9) breached its promise to remedy any failure of the Generators to achieve warranted performance in place; (10) was strictly liable for damages arising from the Generators' defective condition and Imo's failure to warn LILCO regarding that condition; and (11) negligently designed, manufactured, and failed to inspect and test the Generators in reckless disregard of public safety. LILCO sought damages totalling approximately $250 million, which included: (1) the purchase price of the Generators; (2) the costs incurred in investigating their defects; (3) the costs of repairing and testing the Generators; (4) the increased licensing costs, including legal fees, caused by the defects; (5) the increased costs and expenses to construct Shoreham caused by the delays resulting from the defects; (6) costs of purchasing, designing, constructing, and testing the Colt generators and associated buildings and equipment, and other costs that were incurred to avoid delay in the operation of Shoreham; (7) costs of defending the Generators before the PSC; and (8) costs of future testing, inspections, and monitoring required to ensure the Generators' reliability.
 
 
 30
 The district court, expressly reserving the issue of any limitation of the damages until trial, dismissed all counts with the exception of count nine. LILCO I, 646 F.Supp. at 1458-59. Applying New York law, the court held that collateral estoppel effect should be accorded to the PSC's finding that LILCO, or alternatively SWEC as LILCO's agent, knew, or should have known, of the Generator defects by mid-1977. Id. at 1448-51. As a result, the court concluded that the fraud (count three) and RICO (count four) claims were untimely. Id. at 1452-54. Alternatively, the court found that the fraud count failed to state a claim for which relief may be granted because it was in reality only a claim for breach of contract. Id. at 1449.
 
 
 31
 Pursuant to N.Y.U.C.C. Sec. 2-725 (McKinney 1964), a four-year statute of limitations running from tender of delivery, or from the date of discovery if a warranty explicitly extends to the future performance of the goods and discovery of the breach must await the time of such performance, applies to all sales contracts. Because LILCO's complaint was filed more than four years after (i) the Generators were delivered, and (ii) the crankshaft defects should have been discovered, the district court dismissed the breach of contract and warranty claims (counts five, six, seven, and eight). LILCO I, 646 F.Supp. at 1454-56; see alsoLILCO II, 648 F.Supp. at 989-90 (to extent breach of contract claim includes claim for indemnification, it is dismissed for failure to state claim for which relief may be granted). Relying upon Shapiro v. LILCO, 71 A.D.2d 671, 671, 418 N.Y.S.2d 948, 950 (2d Dep't 1979), however, the court held that LILCO's ninth cause of action stated a claim for breach of promise to repair which did not accrue until after installation of the Generators was completed in October 1981 and the crankshaft failure occurred in August 1983. LILCO I, 646 F.Supp. at 1456. The remaining counts of LILCO's complaint (counts one, two, ten, and eleven) were dismissed as failing to state claims under New York law, and alternatively as time-barred. Id. at 1456-58.
 
 
 32
 On March 2, 1987, LILCO filed an amended complaint alleging in six counts: (1) a RICO claim in considerably greater detail than in the original complaint; (2) post-crankshaft-failure fraud; (3) breach of promise to remedy the Generators' failure to achieve warranted performance in place; (4) breach of contract by failing to provide required services during installation and testing; (5) common law indemnity; and (6) contribution. In addition to the damages sought on the contract claim in the original complaint, LILCO sought punitive damages on its contract claims (counts three and four) because of Imo's "wanton dishonesty, moral culpability, wilful endangerment of public safety and fraudulent and deceptive practices aimed at LILCO, the nuclear power industry and the public generally." In addition, the amended pleading named SWEC as a defendant against whom LILCO asserted claims for breach of contract and negligence in connection with Shoreham.
 
 
 33
 Imo moved to dismiss the punitive damage claims included in count three and the remaining counts in their entirety, and SWEC moved to dismiss the two counts against it. LILCO III, 668 F.Supp. at 239. On the basis of two broad "Insurance and Indemnity" clauses contained in LILCO's contract with SWEC, the court held that SWEC was exempt from liability for all the damages sought by LILCO and dismissed the counts of the complaint asserted against SWEC. Id. at 242-44.
 
 
 34
 Based on the collateral estoppel effect of the PSC proceeding, as a result of which LILCO was held to have known of the defects in the Generators by mid-1977, the district court again found LILCO's RICO and fraud claims (counts one and two) to be untimely. Id. at 239-40. Although it did not dismiss count three of the amended complaint, the court held that under New York law punitive damages were unavailable on this claim. Id. at 240-41. Finding counts four and five to be essentially restatements of earlier claims that the court had rejected, these causes of action were also dismissed. Id. at 241-42. Finally, the district court ruled that under New York law LILCO had failed to state a claim for contribution, and accordingly dismissed count six of the amended complaint. The court noted that stripped of the claim for punitive damages, count three of the amended complaint was essentially identical to count nine of the original complaint, with the result that "[w]e are now back in exactly the posture this suit was in after our decision in LILCO I." Id. at 245 n. 4. Finally, the district court denied LILCO leave to file a second amended complaint. Id. at 245.
 
 
 35
 After discovery, Imo moved for summary judgment on LILCO's remaining claim, and LILCO moved for partial summary judgment dismissing Imo's defenses that LILCO had waived its claim against Imo in whole or in part and had failed to give Imo notice of LILCO's claims. LILCO IV, slip op. at 2. The court decided in favor of LILCO with respect to Imo's challenged defenses, id. at 5-6 & n. 11, but also determined that most of LILCO's claimed damages were not recoverable from Imo. Id. at 4-5, 6-11.
 
 
 36
 Specifically, the court held that LILCO could not recover approximately $130 million that it had spent to purchase "alternative emergency power," primarily the Colt generators and the building to house them, because these costs were barred as resembling "cover" damages, which were precluded by LILCO's acceptance of the Generators; were unreasonable and accordingly unforeseeable by Imo; and were not a "reasonable" effort to mitigate damages. Id. at 7-9. The court also disallowed approximately two million dollars in increased licensing costs and approximately two million dollars for LILCO's participation in Owners' Group activities as not flowing from Imo's breach of warranty. Id. at 4-5, 9. The court denied a claim by LILCO for over $100 million for "cost of money" based upon AFUDC because LILCO was "unable to point to a particular loan necessitated by Imo's conduct" or otherwise establish a cost of money attributable to Imo's alleged breach of contract. Id. at 10-11. Thus, LILCO's remaining claim was "dismissed as to all categories of damages other than the amount attributable to the cost of repairing the [Generators], which amount may, upon appropriate showing, include the cost of maintenance or of testing the [Generators] in the course of or subsequent to their repair." Id. at 11.
 
 
 37
 On January 3, 1991, the district court ordered a bifurcated trial, with the initial liability trial limited to the issue whether Imo's repair obligation was in effect at the time when the repair costs were incurred. See LILCO v. Imo Indus. ("LILCO V"), No. 85 Civ. 6892 (RO) (S.D.N.Y. Jan. 3, 1991) (endorsed memorandum). After eight days of trial, on April 10, 1991, the jury found that the repair commitment was in effect from the time the Generators were delivered through July 7, 1986. See LILCO v. Imo Indus. ("LILCO VI"), No. 85 Civ. 6892 (RO) (S.D.N.Y. July 29, 1991) (endorsed memorandum). Imo's motion for judgment notwithstanding the verdict, or alternatively a new trial, was denied. Id.
 
 
 38
 On March 30, 1992, prior to the damages phase of the bifurcated trial, the district court ruled that "the [Imo] warranty does not make Imo a guarantor for all costs incurred by LILCO, but only those necessarily expended in 'repairing or replacing' flawed equipment. Accordingly, the parties are directed to limit their evidence to those costs which specifically fall within the limited nature of the warranty provision covering 'adjustments or modifications to enable the equipment to achieve warranted performance.' " LILCO VII, slip op. at 1.
 
 
 39
 On April 22, 1992, after a thirteen-day damages trial, the jury returned a verdict awarding LILCO $10,809,806 in damages plus prejudgment interest from dates agreed in a stipulation between the parties. On June 18, 1992, the district court denied Imo's renewed motion for judgment notwithstanding the verdict, or in the alternative for remittitur or a new trial. LILCO v. Imo Indus. ("LILCO VIII"), No. 85 Civ. 6892 (RO) (S.D.N.Y. June 18, 1992) (endorsed memorandum). Judgment in the amount of $18,379,336.71 in favor of LILCO against Imo, and dismissing LILCO's claims against SWEC, was entered on July 22, 1992, and this appeal followed.
 
 Discussion
 
 40
 On appeal, LILCO contends that the district court erred in: (1) limiting LILCO to a claim for breach of Imo's undertaking to repair the Generators as necessary to achieve warranted performance in place; (2) dismissing most of LILCO's $250 million claim for damages against Imo; and (3) dismissing LILCO's claims against SWEC. As previously summarized, most of LILCO's claims against Imo were dismissed as barred by the statute of limitations. LILCO argues in this connection that the district court improperly accorded collateral estoppel effect to the PSC's findings that LILCO and SWEC should have known about the crankshaft problems affecting the Generators by 1977. Imo contends on cross-appeal that the district court should have dismissed LILCO's breach of repair claim as untimely, along with all the others.
 
 
 41
 We note preliminarily that we have reviewed LILCO's claims against SWEC, and conclude that they were properly dismissed in view of the unambiguous language of the parties' contract. Accordingly, we affirm the dismissal of LILCO's claims against SWEC for substantially the reasons stated by the district court in LILCO III, 668 F.Supp. at 242-44. We turn to the issues posed by LILCO's claims against Imo.
 
 
 42
 A. Collateral Estoppel Effect of the PSC's Findings.
 
 
 43
 The administrative law judges' recommended decision, subsequently adopted (as modified) by the PSC, determined that "by no later than mid-1977" LILCO, in the exercise of "reasonable management oversight and review," should have been aware of the crankshaft design error in the Generators. Based upon the PSC's findings, the district court held that the statute of limitations began to run on most of LILCO's claims by mid-1977--the date LILCO knew or should have known of the design defects. LILCO I, 646 F.Supp. at 1451-52.
 
 
 44
 28 U.S.C. Sec. 1738 (1988) directs federal courts to accord state judicial proceedings "the same full faith and credit ... as they have by law or usage in the courts of such State ... from which they are taken." SeeMarrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373, 380, 105 S.Ct. 1327, 1331-1332, 84 L.Ed.2d 274 (1985) ("This statute directs a federal court to refer to the preclusion law of the State in which judgment was rendered."). Further, although Sec. 1738 does not apply by its terms to the determinations of state administrative agencies, the Supreme Court explicitly held in University of Tennessee v. Elliott, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), that:
 
 
 45
 [W]hen a state agency "acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate," [United States v.] Utah Construction & Mining Co., [384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966) ], federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.
 
 
 46
 Id. 478 U.S. at 799, 106 S.Ct. at 3226 (footnote omitted); see alsoAstoria Fed. Sav. & Loan Ass'n v. Solimino, --- U.S. ----, ----, 111 S.Ct. 2166, 2169, 115 L.Ed.2d 96 (1991); DeCintio v. Westchester County Medical Ctr., 821 F.2d 111, 116 (2d Cir.), cert. denied, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987).
 
 
 47
 Turning to state law, we must determine whether New York courts would apply the doctrine of collateral estoppel to the PSC's findings in the Prudence Proceeding. The requirements for collateral estoppel under New York law are that the issue be identical and necessarily decided in the prior proceeding, and that the party against whom preclusion is sought was accorded a full and fair opportunity to contest the issue in the prior proceeding. Allied Chem. v. Niagara Mohawk Power Corp., 72 N.Y.2d 271, 276, 528 N.E.2d 153, 155, 532 N.Y.S.2d 230, 232 (1988), cert. denied, 488 U.S. 1005, 109 S.Ct. 785, 102 L.Ed.2d 777 (1989); see alsoTown of Deerfield v. FCC, 992 F.2d 420, 429 (2d Cir.1993) (citing Ryan v. New York Tel. Co., 62 N.Y.2d 494, 500, 467 N.E.2d 487, 490, 478 N.Y.S.2d 823, 826 (1984)). The factual issue of "LILCO's knowledge of the alleged design defects," LILCO I, 646 F.Supp. at 1451, was squarely addressed in the Prudence Proceeding and is dispositive of the statute of limitations issue in the current proceeding. Further, LILCO not only had an opportunity to, but did in fact, litigate this issue thoroughly before the PSC.
 
 
 48
 When the doctrine of collateral estoppel is to be applied to the determinations of administrative agencies, New York courts additionally require that the agency's determination be "quasi-judicial" in character, rather than legislative. SeeAllied Chem., 72 N.Y.2d at 276, 528 N.E.2d at 155, 532 N.Y.S.2d at 232; Consumer Protection Bd. v. Public Service Comm'n, 97 A.D.2d 320, 324, 471 N.Y.S.2d 332, 335 (3d Dep't 1983). This determination calls for a "multifaceted inquiry." Allied Chem., 72 N.Y.2d at 276, 528 N.E.2d at 155, 532 N.Y.S.2d at 232.
 
 
 49
 First, the court must determine that "the agency has the statutory authority to act adjudicatively." Id., 528 N.E.2d at 155, 532 N.Y.S.2d at 232. "[T]here can be no doubt that it is within the PSC's statutory mandate to act adjudicatively." Id. at 277, 528 N.E.2d at 156, 532 N.Y.S.2d at 233 (citing LILCO I ).
 
 
 50
 Next, the procedures employed must assure "that the facts asserted were adequately tested, and that the issue was fully aired." Id. at 276-77, 528 N.E.2d at 155, 532 N.Y.S.2d at 232. In this case, LILCO was afforded numerous procedural protections (including the availability of Article 78 review), and the PSC itself has stated that the proceedings constituted "probably the most extensively litigated record in the [PSC's] history."
 
 
 51
 Third, New York courts consider whether "giving preclusive effect to the [administrative] determination would be unfair, or was in any way unexpected." Allied Chem., 72 N.Y.2d at 277, 528 N.E.2d at 156, 532 N.Y.S.2d at 233. Although LILCO apparently realized the potential preclusive effect of the PSC's proceedings, both the PSC and LILCO now contend that the PSC's findings should not preclude LILCO from litigating the issue of its 1977 knowledge of the crankshaft defects against Imo. The PSC has only stated, however, that it did not determine the legal obligations of Imo or SWEC, and that its decision did not "absolve" those entities from liability. These comments do not bear upon the applicability of collateral estoppel to the PSC's factual findings.
 
 
 52
 This is not a case in which the PSC merely issued an "advisory opinion" without any direct consequences for LILCO. Cf.Staatsburg Water Co. v. Staatsburg Fire Dist., 72 N.Y.2d 147, 153-54, 527 N.E.2d 754, 756-57, 531 N.Y.S.2d 876, 878-79 (1988) (preclusive effect not given to "unsolicited advisory opinion" by PSC that did not bind the parties). The results of the PSC proceeding in this case had the direct consequence that LILCO's shareholders were required to bear a large portion of Shoreham's constructions costs. Further, the PSC made a specific determination whether LILCO's actions with respect to the Generators were prudent and reasonable.
 
 
 53
 Finally, "[t]he court must look at the over-all context of the agency's decision to assess whether according a preclusive effect to a particular agency determination is consistent with the agency's scheme of administration." Allied Chem., 72 N.Y.2d at 277, 528 N.E.2d at 155, 532 N.Y.S.2d at 232. This last requirement incorporates the concern that because rates depend upon economic and policy considerations, all of which may change over time, the PSC must be free to reassess the reasonableness of the rates that it determines. Id. at 278, 528 N.E.2d at 156, 532 N.Y.S.2d at 233. These factors are not implicated in this case. Although the PSC's determination in the Prudence Proceeding ultimately had an impact on the rate charged to LILCO's ratepayers, that determination ensued from a separate, nonrate proceeding commenced for a limited purpose. Cf.Spring Valley Water Co. v. Public Service Comm'n, 176 A.D.2d 95, 98-99, 580 N.Y.S.2d 107, 109 (3d Dep't) (subsequent ratemaking proceeding "simply put into effect the determination arrived at by the PSC in the [prior] land transfer value case"), appeal dismissed, 80 N.Y.2d 825, 600 N.E.2d 634, 587 N.Y.S.2d 907, leave to appeal denied, 80 N.Y.2d 758, 602 N.E.2d 1124, 589 N.Y.S.2d 308 (1992).
 
 
 54
 In sum, the district court correctly concluded that under New York law, because of the prior determination of the issue by the PSC in the Prudence Proceeding, LILCO should be charged with knowledge of the Generators' crankshaft defects by mid-1977.
 
 
 55
 B. Dismissal of LILCO's Claims.
 
 
 56
 LILCO reiterates on this appeal the arguments that it made unavailingly to the district court regarding the dismissal of most of its claims. LILCO does not contend on appeal, however, for the restoration of the failure to warn, negligence, and strict liability claims of its initial complaint (counts one, two, ten, and eleven), or of the indemnity and contribution claims of its amended complaint (counts five and six). In any event, we agree with the district court's dismissal of these claims for the reasons stated by the district court. SeeLILCO I, 646 F.Supp. at 1456-58 (initial complaint); LILCO III, 668 F.Supp. at 241-42 (amended complaint).
 
 
 57
 The district court correctly concluded, in our view, that once it is established that LILCO knew or should have known about the crankshaft design defect in the Generators by mid-1977, all of LILCO's other claims (except the promise to repair that is the subject of Imo's cross-appeal) must be dismissed as time-barred. In view of our agreement with this conclusion, we need not and do not address the district court's alternative ruling that LILCO's fraud claims should be dismissed as essentially stating contract claims. SeeLILCO I, 646 F.Supp. at 1448-49; LILCO III, 668 F.Supp. at 240.
 
 
 58
 As to LILCO's fraud claims, the New York statute of limitations for fraud is six years from the date of commission, see N.Y.Civ.Prac.Law & R. 213(8) (McKinney 1990), or two years from the date the plaintiff discovered, or should have discovered, the fraud, whichever is longer. Id. 213(8), 203(f). LILCO contends that Imo made post-1977 misrepresentations to LILCO regarding both the crankshafts and other defects in the Generators. LILCO has not shown, however, that any such misrepresentations caused any significant distinct harm to LILCO, and thus gave rise to separate claims, because the crankshaft defects that were apparent in 1977 ultimately required the complete overhaul and repair of the Generators in any event.[3] Accordingly, the fraud action accrued in 1977, and the statute of limitations barred its initiation in 1985, taking into account the 1984 standstill agreement. See supra note 2.
 
 
 59
 The district court also correctly held that LILCO's RICO claims accrued in 1977 and accordingly were untimely. See Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987) (RICO claims subject to four-year statute of limitations). Relying upon Cruden v. Bank of New York, 957 F.2d 961 (2d Cir.1992), LILCO asserts that its claim did not accrue until 1983, when the crankshafts failed and LILCO suffered injury. LILCO's reliance upon Cruden is misplaced.
 
 
 60
 We pointed out in Cruden that a RICO civil action requires a plaintiff to show that "he has been 'injured in his business or property' [, 18 U.S.C. Sec. 1964(c) (1988),] by reason of a violation of 18 U.S.C. Sec. 1962 [ (1988) ]." 957 F.2d at 977 (citing Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1102 (2d Cir.1988), cert. denied, 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989)). Consequently, although the claims of the Cruden plaintiffs, holders of defaulted debentures, were premised upon earlier fraud, we ruled that their RICO claim did not accrue until the debentures went into default. Id. at 977-78. Prior to default, both injury and the related damages were deemed too speculative to support the accrual of a RICO claim. Seeid.
 
 
 61
 The situation here is quite different. Our ruling in Cruden relied upon Bankers Trust. In Bankers Trust, we made it clear that " '[u]nder federal principles, a claim accrues when the plaintiff "knows or has reason to know" of the injury that is the basis of the action.' " 859 F.2d at 1103 (quoting Cullen v. Margiotta, 811 F.2d 698, 725 (2d Cir.) (quoting Pauk v. Board of Trustees, 654 F.2d 856, 859 (2d Cir.1981), cert. denied, 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866 (1982)), cert. denied, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987)). LILCO should have known in 1977 that Imo had delivered defective Generators to LILCO. LILCO's injury was not in any sense speculative at that juncture, and its RICO claim accrued at that time.
 
 
 62
 LILCO also challenges the district court's dismissal of its breach of contract and breach of warranty claims. The contract with Imo was a transaction for the sale of goods and is governed by Article 2 of the Uniform Commercial Code (the "U.C.C."). See N.Y.U.C.C. Sec. 2-102 (McKinney 1964).
 
 
 63
 Section 2-725 of the U.C.C. provides the governing rule for both the dismissed breach of contract and breach of warranty claims. It provides in pertinent part:
 
 
 64
 (1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.
 
 
 65
 (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.
 
 
 66
 N.Y.U.C.C. Sec. 2-725(1) & (2) (McKinney 1964).
 
 
 67
 Imo's breach of its contractual obligation to supply qualified generators accrued when the Generators were delivered, Sec. 2-725(2), and therefore LILCO's initial claim for breach of contract was properly dismissed as untimely. SeeLILCO I, 646 F.Supp. at 1454-55. Similarly, the claim asserted in LILCO's amended complaint for breach of contract to provide installation services was also untimely. Although this claim is given a different name, LILCO's allegations under this count essentially restate its assertion that Imo breached its obligation to provide LILCO with information regarding the Generators' defects. We agree with the district court that this breach occurred when the nonconforming goods were delivered. SeeLILCO III, 668 F.Supp. at 241.
 
 
 68
 LILCO's breach of warranty claims were also dismissed by the district court as time-barred. Section 2-725(2) provides that unless a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, a breach of the warranty occurs when tender of delivery of the goods is made. In the event that a warranty extends to the future performance of the goods, however, the claim accrues when the aggrieved party knew of or should have discovered the breach. Id.
 
 
 69
 LILCO alleged that Imo breached its warranty that the Generators would be suitable for their intended purpose and that they would function as warranted. Assuming arguendo that LILCO's claims for breach of warranty extended to the future performance of the Generators and the warranty claims did not accrue on the date of their delivery, based on the PSC finding, the claims accrued no later then mid-1977, and accordingly were properly dismissed.
 
 
 70
 C. Imo's Cross-Appeal: LILCO's Claim for Breach of Promise to Repair.
 
 
 71
 On its cross-appeal, Imo asserts that the district court should have dismissed LILCO's breach of promise to repair claim as untimely. LILCO alleged that Imo breached the following provision in their contract:
 
 
 72
 In the event the equipment fails to achieve the warranted performance in place, then, to the extent that the deficiency or failure to achieve the warranted performance is attributable to equipment supplied by [Imo], [Imo] shall make such adjustments or modifications to enable the equipment to achieve the warranted performance. The costs of these adjustments and modifications shall be for [Imo's] account.
 
 
 73
 Imo's promise to repair was a promise to perform services. Nonetheless, Article 2 of the UCC is applicable because the overall "agreement was one predominantly for the sale and delivery of goods." J.I. Hass Co. v. Frank A. Kristal Assocs., Inc., 127 A.D.2d 541, 542, 512 N.Y.S.2d 104, 105 (1st Dep't), appeal denied, 69 N.Y.2d 611, 511 N.E.2d 84, 517 N.Y.S.2d 1025 (1987); see alsoTriangle Underwriters, Inc. v. Honeywell, Inc., 604 F.2d 737, 742-43 (2d Cir.1979); LILCO III, 668 F.Supp. at 241.
 
 
 74
 The district court ruled in favor of LILCO on this claim, stating that:
 
 
 75
 Unlike a warranty of future performance, a breach of which arises when the plaintiff should have discovered the breach, an express promise to repair or replace arises when the equipment malfunctions. Shapiro v. [LILCO], 71 A.D.2d 671, 418 N.Y.S.2d 948, 950 (2d Dep't 1979). Paragraph 94 of the complaint states a claim for breach of promise to repair the diesels if they fail to achieve warranted performance in place. This could not accrue until the diesels were installed and failed to perform. The diesels were not completely installed until October 1981. Preoperational testing was completed in June 1983, and the crankshaft failure occurred in August 1983. This action was filed in August 1985, less than four years after installation and two years after a specific malfunction that required repair or replacement of the diesels. Thus, LILCO's ninth cause of action for breach of promise to repair or modify the diesels to achieve warranted performance in place is timely, and we deny [Imo's] motion to dismiss this claim.
 
 
 76
 LILCO I, 646 F.Supp. at 1456 (footnotes omitted). LILCO's claim that Imo breached its promise to repair the Generators was accordingly presented to the juries in the bifurcated trial, and ultimately judgment was returned in favor of LILCO.
 
 
 77
 In Shapiro, the plaintiff brought an action to recover for extensive water damage caused by a defective water heater. The contract of sale included a "10 year warranty" that obligated the supplier of the heater to "furnish a complete replacement water heater if the tank develops a leak within 10 years after installation." 71 A.D.2d at 671, 418 N.Y.S.2d at 949. The supplier moved to dismiss the complaint as time-barred pursuant to Sec. 2-725. The plaintiff countered that although delivery had been made more than four years earlier, the warranty explicitly extended to future performance and therefore the action, filed within four years after the water heater failed, was timely pursuant to Sec. 2-725(2). Id. at 671, 418 N.Y.S.2d at 949.
 
 
 78
 The Appellate Division, Second Department dismissed the suit, stating:
 
 
 79
 It has been held that an agreement to repair does not amount to an explicit warranty of the future performance of the goods (Owens v. Patent Scaffolding Co. Div. of Harsco, 77 Misc.2d 992, 998, 354 N.Y.S.2d 778, 784; revd. on other grounds 50 A.D.2d 866, 376 N.Y.S.2d 948). The principle applies with equal force to a guaranty to replace (Centennial Ins. Co. v. General Elec. Co., 74 Mich.App. 169, 253 N.W.2d 696). Thus, [the supplier] did not explicitly promise that the unit would not malfunction; only that if it did, it would be replaced. Accordingly, the four-year Statute of Limitations applied and the complaint should have been dismissed.
 
 
 80
 71 A.D.2d at 671, 418 N.Y.S.2d at 950. The court also stated, however, that "[b]ecause the contract warranty is good for 10 years by its own terms, it is evident that it survives the four-year Statute of Limitations in some respects. The seller has promised to replace the defective unit for 10 years and that promise is undoubtedly enforceable by the buyer." Id. Accordingly, the plaintiff was permitted to commence a new action founded "upon such causes of action." Id.
 
 
 81
 Other New York cases support this analysis. In Bulova Watch Co. v. Celotex Corp., 46 N.Y.2d 606, 389 N.E.2d 130, 415 N.Y.S.2d 817 (1979), a roofing materials supplier provided an express promise to repair the "bonded" roof that it had installed for twenty years, but then reneged on the commitment. The purchaser sued, but the trial court dismissed the action as premised upon the breach of an implied warranty and barred by the statute of limitations, and the Appellate Division, Second Department affirmed the ruling of the trial court. Id. at 609, 389 N.E.2d at 131, 415 N.Y.S.2d at 819. Reversing, the Court of Appeals ruled that "[t]he bonds embody an agreement distinct from the contract to supply roofing materials," id. at 610, 389 N.E.2d at 132, 415 N.Y.S.2d at 819, and "h[e]ld that a cause of action accrues upon each breach of that undertaking which occurs within the 20-year period and that the Statute of Limitations runs after six years from the date when the particular breach for which any such suit is brought takes place." Id. at 608, 389 N.E.2d at 131, 415 N.Y.S.2d at 818.
 
 
 82
 Similarly, Board of Education v. Celotex Corp., 151 A.D.2d 536, 542 N.Y.S.2d 671 (2d Dep't 1989) (per curiam), dismissed a breach of warranty action for consequential damages resulting from a defective roof as time-barred, but allowed a breach of contract action against the roof supplier for its alleged failure to repair the roof, despite repeated demands, pursuant to a ten-year "Roof Inspection and Service Contract." Id. at 537-38, 542 N.Y.S.2d at 672-73. In Queensbury Union Free School District v. Jim Walter Corp., 101 A.D.2d 992, 477 N.Y.S.2d 475 (3d Dep't 1984) (per curiam), aff'd mem., 64 N.Y.2d 964, 477 N.E.2d 1106, 488 N.Y.S.2d 652 (1985), a claim of implied warranty was dismissed as time-barred, but summary judgment was granted to plaintiff on a repair bond which "guaranteed that for 20 years defendant Celotex would repair any leaks [in the roof it supplied] caused by ordinary wear and tear by the elements." 101 A.D.2d at 993, 477 N.Y.S.2d at 477. The court noted that "the bond, as merely an agreement to repair, is not an express warranty of the future performance of the roof." Id. (citing Shapiro ).
 
 
 83
 In the instant case, Imo promised to repair the Generators if they failed to operate "in place." A natural reading of the contract was that "in place" referred to when the Generators were installed, rather than the period of time during which they were in storage. SeeLILCO I, 646 F.Supp. at 1456. Indeed, the contract expressly provided that the repair obligation would "extend one year from the initial operation of the plant (which date shall be mutually agreed upon by the parties in writing)." Accordingly, the jury that tried the liability issue found that the repair obligation expired on July 7, 1986. See LILCO VI, slip op. at 1.
 
 
 84
 Although Imo did not warrant the future performance of the goods, it promised LILCO that it would repair the Generators if they failed to achieve the warranted performance in place. The Generators failed to perform "in place" some time after their initial installation in the fall of 1981. At that juncture, Imo breached its promise to repair the Generators when it maintained that it was not obligated to make the necessary repairs. Only then did LILCO's claim for a breach of the promise to repair "accrue" within the meaning of Sec. 2-725. LILCO instituted the present action less than four years after the initial installation of the Generators, and thus its claim was timely.
 
 
 85
 D. Reduction of LILCO's Damage Claims.
 
 
 86
 A number of the district court's rulings addressed damages issues. In LILCO I, the district court reserved the issue whether Imo could enforce a contractual provision that "under no circumstances shall [Imo] be liable for special or consequential damages" in view of LILCO's claim that Imo had breached its contractual repair obligation in bad faith. See 646 F.Supp. at 1458-59. LILCO III dismissed LILCO's claim for punitive damages resulting from Imo's breach of its obligation to repair the Generators. See 668 F.Supp. at 240-41. LILCO IV determined that most of LILCO's claimed damages were not recoverable from Imo, including incidental and consequential damages and LILCO's claimed AFUDC "cost of money" claim, see slip op. at 6-11, and accordingly dismissed LILCO's remaining claim "as to all categories of damages other than the amount attributable to the cost of repairing the [Generators], which amount may, upon appropriate showing, include the cost of maintenance or of testing the [Generators] in the course of or subsequent to their repair." Id. at 11. LILCO VII reiterated the limitation of damages articulated in greater detail in LILCO IV, and directed that the parties limit their evidence at the damages trial "to those costs which specifically fall within the limited nature of the warranty provision covering 'adjustments or modifications to enable the equipment to achieve warranted performance.' " LILCO VII, slip op. at 1.
 
 
 87
 We see no need to revisit these issues, which have been thoroughly considered and correctly resolved by the district court. The district court properly fixed the jury's focus upon the repair costs that were the sole damages that could be recovered on Imo's only surviving claim. There is accordingly no basis for a greater recovery by LILCO than it has already achieved in this litigation.
 
 Conclusion
 
 88
 We affirm the judgment of the district court. Costs to SWEC against LILCO; both Imo and LILCO to bear their own costs.
 
 
 
 *
 Daniel M. Friedman of the United States Court of Appeals for the Federal Circuit, sitting by designation
 
 
 [1]
 During the course of the events described and the proceedings below, defendant-appellee-cross-appellant changed its name from Transamerica Delaval, Inc. to Imo Delaval, Inc., and then to Imo Industries Inc. The corporation shall be referred to as "Imo" throughout this opinion
 
 
 [2]
 The parties entered a standstill agreement in 1984 under which the statute of limitations was tolled pending the conclusion of the Prudence Proceeding. LILCO I, 646 F.Supp. at 1452 n. 16. The agreement, however, does not affect any of the limitations periods involved in this appeal
 
 
 [3]
 This observation is equally applicable to LILCO's RICO claims with respect to alleged post-1977 misrepresentations